**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Criminal Case No.  24-cr-00088-NYW

UNITED STATES OF AMERICA,

      Plaintiff,

v.

TAREK KASSEM,

      Defendant.

---

**PLEA AGREEMENT**

---

The United States of America (the government), by and through Nicole Cassidy,

Assistant United States Attorney for the District of Colorado, and the defendant, Tarek Kassem,

personally and by counsel, Jared Westbroek, submit the following Plea Agreement pursuant to

D.C.COLO.LCrR 11.1.  This agreement binds only the Criminal Division of the United States

Attorney's Office for the District of Colorado and the defendant.

**I.**      <u>**AGREEMENT**</u>

**A.**    **Defendant's Plea of Guilty:**

The defendant agrees:

(1)     to plead guilty to **Counts 6** and **8** of the Indictment, charging violations of 18 U.S.C. § 1343 (wire fraud) and 18 U.S.C. § 1957 (money laundering), respectively;

(2)     to waive certain appellate and collateral attack rights, as explained in detail below;

Page 1 of 18

**COURT EXHIBIT 1**

(3)     be liable for restitution to the Small Business Administration ("SBA") and the Colorado Department of Labor & Employment ("CDLE") in the amount estimated to be $1,793,718.75[1], plus interest on the EIDLs and PPP loans accruing through the date of the sentencing hearing less any repayments that the defendant has made towards the loans prior to sentencing; and

(4)     to not contest forfeiture as more fully described below.

**B.     Government's Obligations:**

This agreement is made pursuant to Federal Rule Criminal Procedure 11(c)(1)(A) and (B). The government agrees to recommend a sentence at the bottom of the guidelines range for the defendant's criminal history and total offense level, as calculated by the Court at sentencing. The defendant is free to file a motion for a variance under 18 U.S.C. § 3553(a).

The government further agrees not to bring other charges against the defendant based on information currently known to the United States Attorney's Office, District of Colorado concerning fraud against the government programs described below and agrees to move to dismiss Counts 1–5, 7, and 9–10 of the Indictment with prejudice at the time of sentencing. Should the plea of guilty be vacated on the motion of the defendant, the government may, in its sole discretion, move to reinstate any or all of the counts dismissed pursuant to this agreement and potentially file a superseding indictment. The parties understand that this agreement is not binding on the Court.

---

[1] This amount includes: (1) $1,425,900 of EIDLs, $307,367 of PPPs, and $4,000 of EIDGs received by businesses purportedly owned and operated by the defendant; (2) $100 of UCC-1 filing fees paid by the SBA in connection with the defendant's funded EIDL; and (3) PPP processing fees totaling $16,826.75, which were paid by the SBA to PPP lenders for underwriting and processing the defendant's PPP loans; and $39,525 of unemployment benefits that the defendant received from the CDLE.

Provided the defendant does not engage in prohibited conduct or otherwise implicate USSG §§ 3C1.1 and 3E1.1, cmt. n.4 between the guilty plea and sentencing in this case, the government agrees that the defendant should receive a two-level reduction for acceptance of responsibility pursuant to USSG § 3E1.1(a) and agrees to file a motion requesting that the defendant receive a one-level reduction for acceptance of responsibility pursuant to USSG § 3E1.1(b). If the defendant engages in conduct which implicates USSG § § 3C1.1 cmt. n.4 between the guilty plea and sentencing in this case, in addition to any other consequences, the government will be released from its obligations under the plea agreement, and the defendant will not thereby have any right to withdraw from the plea agreement.

**C.    Defendant's Waiver of Appeal:**

The defendant is aware that 18 U.S.C. § 3742 affords the right to appeal the sentence, including the manner in which that sentence is determined. Understanding this, and in exchange for the concessions made by the government in this agreement, the defendant knowingly and voluntarily waives the right to appeal any matter in connection with this prosecution, conviction, or sentence (including the restitution order), unless it meets one of the following criteria:

(1)    the sentence exceeds the maximum sentence provided in the statutes of conviction, 18 U.S.C. §§ 1343 & 1957;

(2)    the sentence exceeds the top end of the advisory guideline range from the Sentencing Guidelines that applies for the defendant's criminal history (as determined by the district court) at a total offense level of **25**; or

(3)    the government appeals the sentence imposed.

If the first criterion applies, the defendant may appeal only the issue of how his sentence exceeds the statutory maximum sentence. But if one of the latter two criteria apply, the

defendant may appeal on any ground that is properly available in an appeal that follows a guilty plea.

The defendant also knowingly and voluntarily waives the right to challenge this prosecution, conviction, or sentence (including the restitution order) in any collateral attack (including, but not limited to, a motion brought under 28 U.S.C. § 2255). This waiver provision does not prevent the defendant from seeking relief otherwise available in a collateral attack on any of the following grounds:

(1)    the defendant should receive the benefit of an explicitly retroactive change in the sentencing guidelines or sentencing statute;

(2)    the defendant was deprived of the effective assistance of counsel; or

(3)    the defendant was prejudiced by prosecutorial misconduct.

The government agrees not to argue a procedural bar to a prosecutorial misconduct claim raised in a § 2255 petition based on the failure of the defendant to raise that issue on direct appeal.

The defendant also waives the right to appeal any sentence imposed below or within the Guideline range upon a revocation of supervised release in this case number, except where the defendant unsuccessfully objects to the grade of violation applied by the court during the district court revocation proceedings. In that event, this waiver does not apply and the defendant may appeal the sentence imposed upon a revocation of supervised release, even if that sentence falls below or within the guideline range calculated by the court.

The defendant also waives the right to appeal the denial of any motion filed under 18 U.S.C. § 3582(c)(1)(A) where such denial rests in any part upon the court's determination that a sentence reduction is not warranted under the factors set forth in 18 U.S.C. § 3553(a). This

waiver does not apply to an appeal of a denied § 3582(c)(1)(A)(i) motion where the district court, in denying the motion on § 3553(a) grounds, failed to consider the facts allegedly establishing extraordinary and compelling circumstances as part of its § 3553(a) analysis.

**D.     Forfeiture of Assets:**

The defendant admits the forfeiture allegations.  The defendant further agrees to forfeit to the United States immediately and voluntarily any and all assets and property, or portions thereof, subject to forfeiture, pursuant to Title 18, United States Code, Sections 981(a)(1)(C), 982(a)(2), and Title 28, United States Code, Section 2461(c), whether in the possession or control of the United States, the defendant, the defendant's nominees, or elsewhere.  The assets to be forfeited specifically include, but are not limited to a money judgment in the amount of proceeds obtained by the scheme and by the defendant, which is $1,776,792[2].  The defendant agrees and consents to the forfeiture of these assets pursuant to any federal criminal, civil, and/or administrative forfeiture action.  The defendant further agrees to the forfeiture of any substitute assets up to the value of any property described above pursuant to 21 U.S.C. § 853(p) and Federal Rules of Criminal Procedure 32.2(e).

Any restitution payments made at least 30 days in advance of sentencing will be credited towards satisfaction of both restitution and the forfeiture money judgment.  Forfeiture of the defendant's assets after this date shall not be treated as satisfaction of any fine, restitution, cost of imprisonment, or any other penalty this Court may impose upon the defendant in addition to forfeiture, except as outlined in the paragraph below.

---

[2] No UCC-1 filing fees or interest have been included in this amount.

The United States Attorney's Office for the District of Colorado will recommend to the Attorney General that any net proceeds derived from the sale of the judicially forfeited assets be remitted or restored to eligible victims of the offense, for which the defendant has pleaded guilty, pursuant to 18 U.S.C. § 981(e), 28 C.F.R. pt. 9, and any other applicable laws, if the legal requirements for recommendation are met. The defendant understands that the United States Attorney's Office only has authority to recommend such relief and that the final decision of whether to grant relief rests solely with the Department of Justice, which will make its decision in accordance with applicable law.

## II.    ELEMENTS OF THE OFFENSE

### A.    Count 6 (Wire Fraud)

The parties agree that the elements of the wire fraud offense charged in Count 6 of the Indictment are as follows:

1.    The defendant devised a scheme to defraud;

2.    The defendant acted with specific intent to defraud;

3.    The defendant used, or caused another person to use, interstate or foreign wire communications facilities for the purpose of carrying out the scheme; and

4.    The scheme employed false or fraudulent pretenses, representations, or promises that were material.[3]

### B.    Count 8 (Money Laundering)

The parties agree that the elements of the money laundering offense charged in Count 8 of the Indictment are as follows:

1.    the defendant knowingly engaged or attempted to engage in a monetary

---

[3] Tenth Circuit Pattern Jury Instructions (Criminal Cases), 2025 Edition, § 2.57.

transaction;

2.    the defendant knew that the transaction involved criminally derived property;

3.    the property had a value greater than $10,000;

4.    the property was, in fact, derived from a specified unlawful activity; and

5.    the monetary transaction occurred in the United States.[4]

### III.    STATUTORY MAXIMUM SENTENCE

The maximum penalties for a violation of Count 6 (Wire Fraud, 18 U.S.C. § 1343) of the Indictment are: not more than 20 years' imprisonment, a fine of not more than the greater of $250,000 or twice the gain or loss from the offense, or both; not more than 3 years' supervised release; a $100 mandatory victim's fund assessment fee; plus, restitution and forfeiture in an amount to be determined at the time of sentencing.

The maximum penalties for a violation of Count 8 (Money Laundering, 18 U.S.C. § 1957) of the Indictment are: not more than 10 years' imprisonment, a fine of not more than the greater of $250,000 or twice the gain or loss from the offense, or both; not more than 3 years' supervised release; a $100 mandatory victim's fund assessment fee; plus, restitution and forfeiture in an amount to be determined at the time of sentencing.

### IV.    COLLATERAL CONSEQUENCES

The conviction may cause the loss of civil rights, including, but not limited to, the rights to possess firearms, vote, hold elected office, and sit on a jury.

---

[4] Model Crim. Jury Instr. 9th Cir. 18.7 Money Laundering (18 U.S.C. § 1957) (2022).

## V.    STIPULATION OF FACTS

The factual basis for this plea is set forth below.  Because the Court must, as part of its sentencing methodology, compute the advisory guideline range for the offense of conviction, consider relevant conduct, and consider the other factors set forth in 18 U.S.C. § 3553, additional facts may be included below which are pertinent to those considerations and computations.  To the extent the parties disagree about the facts set forth below, the stipulation of facts identifies which facts are known to be in dispute at the time of the execution of the plea agreement.

This stipulation of facts does not preclude either party from presenting non-contradictory additional facts which are relevant to the Court's guideline computation, to other 18 U.S.C. § 3553 factors, or to the Court's overall sentencing decision.

The parties stipulate that the following facts are true and correct.

### Background About the PPP and EIDL Programs

On March 27, 2020, the President of the United States signed into law the Coronavirus Aid, Relief, and Economic Security ("CARES") Act, which provided emergency assistance, administered by the SBA, to small business owners suffering adverse economic effects caused by the Coronavirus ("COVID-19") pandemic.  The CARES Act established several new temporary programs and expanded existing programs, including programs created or administered by the SBA.  Two sources of funding for small businesses were the Paycheck Protection Program ("PPP") and the Economic Injury Disaster Loan ("EIDL") program.  The CARES Act mandated that only businesses in operation on February 15, 2020, for PPPs, or before February 1, 2020, for EIDLs, were eligible under the programs.

The EIDL program was an SBA program that provided low-interest financing to small businesses in regions affected by declared disasters. The CARES Act authorized the SBA to provide EIDLs to eligible small businesses experiencing substantial financial disruptions due to the COVID-19 pandemic. In addition, the CARES Act authorized the SBA to issue advances, known as Economic Injury Disaster Grants ("EIDG"), of up to $10,000 to small businesses. The amount of the EIDG was determined by the number of employees listed on the EIDL application, and the EIDGs did not need to be repaid.

Until April 2021, under the EIDL program, a small business could receive a loan from the SBA in an amount of up to six months of working capital with a maximum of $150,000. In April 2021, the SBA increased the EIDL limit to allow small businesses to receive loans in the amount of up to 24 months of working capital with a maximum of $500,000. Thereafter, in September 2021, the SBA increased the EIDL limit to $2 million. Additionally, after receiving an initial EIDL loan, small businesses could apply to increase their loan amount (up to the maximum EIDL limit in place at the time).

In order to obtain an EIDL and/or EIDG, a qualifying business was required to submit an application to the SBA and provide information about its operations, including the business's gross business revenues and cost of goods sold in the twelve months prior to January 31, 2020. The amount of the loan, if approved, was determined based on the information provided concerning the gross revenue and cost of goods sold. For loans greater than $25,000, the SBA withheld a $100 fee from the total EIDL loan amount for filing a UCC-1 lien on the borrower's business assets. EIDL and EIDG funds were issued directly by the SBA and could be used for

payroll expenses, sick leave, production costs, and business obligations, such as debts, rents, and mortgage payments.

The CARES Act further authorized the PPP program, which provided forgivable loans to small businesses. To obtain a PPP loan, a qualifying small business was required to submit a PPP loan application, signed by an authorized representative of the business, in which the applicant acknowledged the program rules and made certain affirmative certifications. The applicant was also required to state the business's: (a) average monthly payroll expenses; and (b) number of employees. These figures were used to calculate the loan amount that the business was eligible to receive under the PPP. Businesses were also required to provide documentation showing their payroll expenses.

PPP loan applications were received and processed, in the first instance, by a participating lender. If a PPP loan application was approved, the participating lender funded the loan using its own monies, but the loans were guaranteed by the SBA. Data from the application, including information about the borrower, the total amount of the loan, and the listed number of employees, was transmitted by the lender to the SBA in the course of processing the loan.

The proceeds of a PPP loan could be used for certain specified items, such as payroll costs, mortgage interest payments, and utilities. The proceeds of a PPP loan were not permitted to be used by the borrowers to purchase consumer goods or to fund the borrower's ordinary day-to-day living expenses unrelated to the specified authorized business expenses.

### COVID-19 Unemployment Benefit Programs

Unemployment Insurance ("UI") is a joint state and federal program that provides temporary financial assistance to workers who become unemployed through no fault of their own. State workforce agencies oversee and/or administer the UI program in their respective states. In general, claimants seeking UI benefits are required to complete an online application that includes, among other things, the claimant's name, date of birth, social security number, and the reason why the claimant became unemployed. State workforce agencies rely on the information provided in the application to determine UI benefits eligibility. In Colorado, the UI program is administered by the Colorado Department of Labor & Employment ("CDLE").

Beginning in or around March 2020, in response to the COVID-19 pandemic, several federal programs expanded UI eligibility and increased UI benefits, including the Pandemic Unemployment Assistance ("PUA") program, Federal Pandemic Unemployment Compensation ("FPUC"), and Lost Wages Assistance Program ("LWA").

The PUA was designed to provide unemployment benefits to workers affected by the COVID-19 pandemic who were not otherwise eligible for regular unemployment benefits. In order to be eligible for PUA benefits, claimants were required to provide certain personal identifying information and self-certify that they met one of the COVID-19 related reasons for being unemployed, partially unemployed, or unable or unavailable to work.

FPUC allowed states to provide an additional $600 per week to individuals collecting UI benefits through various UI programs. Furthermore, a Presidential Memorandum authorized the Federal Emergency Management Agency ("FEMA") to use disaster relief funds to provide

supplemental payments for lost wages to help ease the financial burden on individuals who became unemployed as a result of the COVID-19 pandemic.

## The Defendant's Scheme to Defraud

From March 2020 through February 2022, the defendant prepared and submitted fraudulent EIDL and PPP applications to the SBA and PPP lenders on behalf of the following business entities that he purportedly operated: Teraca Corporation, Vexita Corporation, and Global Assets Corporation. In these EIDL and PPP applications, the defendant made materially false statements regarding, *inter alia*, the entities' number of employees, gross revenues, cost of goods sold, and average monthly payroll; he further falsely certified that the information provided in the applications was true and accurate and that the funds would be used to pay payroll and other permissible expenses when, in fact, he used the bulk of the proceeds for his personal benefit. He further submitted false documentation in support of the EIDL and PPP applications to the SBA and PPP lenders.

The SBA approved and funded one EIDL in the amount of $1,426,000 and one EIDG in the amount of $4,000. In total, $1,430,000 of EIDL and EIDG proceeds were paid out to the defendant under the CARES Act. These funds, minus a $100 processing fee for the EIDL, were sent to bank accounts controlled by the defendant. Additionally, PPP lenders approved and funded five PPP loans totaling $307,367, which were sent to bank accounts controlled by the defendant. The defendant subsequently sought, and received, loan forgiveness for these PPP loans by submitting loan forgiveness applications in which he made materially false representations regarding his businesses and his compliance with the PPP program rules, including rules relating to the eligible uses of PPP loan proceeds. The SBA also paid $16,826.75

in processing fees to third-party lenders for underwriting and servicing these PPP loans.

The funded EIDLs, EIDGs, and PPP loans are listed below:

| Application Date | Loan Type | Loan Number | Company | PPP Processing Fees | Funded EIDGs | Funded Loan Amount |
|---|---|---|---|---|---|---|
| 3/31/2020 | EIDL | N/A (application number 3300860372) | Teraca Corporation | N/A | $4,000 | $0 – EIDL was declined |
| 4/22/2020 | PPP | 2031318002 | Teraca Corporation | $4,400.00 | N/A | $88,000.00 |
| 6/29/2020 | PPP | 6157988008 | Vexita Corporation | $1,126.75 | N/A | $22,535.00 |
| 2/3/2021 | PPP | 3527358404 | Teraca Corporation | $4,400.00 | N/A | $88,000.00 |
| 4/1/2021 | PPP | 6240128706 | Vexita Corporation | $2,500.00 | N/A | $20,832.00 |
| 4/20/2021 | PPP | 3574528900 | Global Assets Corporation | $4,400.00 | N/A | $88,000.00 |
| 6/11/2021 | EIDL | 3444169102 | Vexita Corporation | N/A | N/A | $1,426,000 |
| | | | **Totals** | **$16,826.75** | **$4,000** | **$1,733,367 ($1,426,000 EIDL and $307,367 PPPs)** |

In addition to these funded loans, the defendant prepared and submitted additional fraudulent EIDL applications, EIDL modification requests, and PPP applications that were declined or rejected prior to funding.

Beginning in or around April 2020, the defendant also sought and received unemployment benefits from the CDLE. In his UI applications, he made materially false statements regarding, *inter alia*, his eligibility for unemployment benefits during the COVID-19 pandemic. In total, between May 2020 and September 2021, the defendant received $39,525 in

UI benefits from the CDLE. Pursuant to 18 U.S.C. § 3663(a)(3), the defendant agrees to include the UI benefits that he received in the calculation of his loss amount, restitution, and forfeiture.

The parties estimate that the total amount of the UI benefits, EIDLs, EDIGs, and PPP loan applications, funded and unfunded, attributed to the defendant is $3,866,892. Of that amount, the defendant received proceeds totaling $1,776,792.

**Restitution:** The defendant understands and agrees that he has an obligation to pay restitution on the amount of the funded EIDLs, EIDGs, PPP loans, and unemployment benefits that he received, as well as the $100 UCC fee paid by the SBA on each funded EIDL and the PPP processing fees paid by the SBA on each PPP loan. The total amount of restitution is currently estimated to be $1,793,718.75. The defendant also agrees to pay the amount of interest accruing on the funded EIDL and PPP loans through the date of sentencing. Final interest figures will be presented prior to the time of sentencing.

**Count 6:** As charged in the Indictment, the defendant agrees that on or about June 11, 2021, he knowingly prepared and submitted a fraudulent EIDL application (3320740987) to the SBA on behalf of Vexita Corporation.

With respect to this application, on or about March 2, 2022, the SBA in Denver, Colorado created and certified the payment file for the EIDL pertaining to Vexita Corporation and transmitted it via interstate wire communications from Colorado to the U.S. Treasury processing site located in the Kansas City Regional Operations Center in Kansas City, Missouri. After a computer operator at the U.S. Treasury disbursing office in Kansas City, Missouri performed payment operations to complete the processing of the file, an Automated Clearing House (ACH) payment file was transmitted to the Federal Reserve Bank ACH processing site in

New Jersey.  The Federal Reserve Bank in New Jersey processed the payment file and sent

$1,425,900 to a Wells Fargo Bank account opened on behalf of Vexita Corporation.

**Count 8**: On or about September 6, 2022, the defendant transferred $15,000 of EIDL

proceeds from Vexita Corporation's Wells Fargo bank account to a Wells Fargo bank account in

his own name.  On the same date, he initiated an online transfer of $13,512.04 of those EIDL

proceeds to Newrez-Shellpoint.  At the time he initiated this monetary transaction, he knew that

the funds being transferred were derived from the fraudulently obtained EIDL.  The defendant

was located in the District of Colorado at the time of this monetary transaction.

**Acceptance of Responsibility**: The defendant accepted responsibility for his conduct in a

timely fashion after the Indictment was returned in this case.

## VI.   ADVISORY GUIDELINE CALCULATION

The parties understand that the imposition of a sentence in this matter is governed by 18

U.S.C. § 3553.  In determining the particular sentence to be imposed, the Court is required to

consider seven factors.  One of those factors is the sentencing range computed by the Court

under advisory guidelines issued by the United States Sentencing Commission.  In order to aid

the Court in this regard, the parties set forth below their estimate of the advisory guideline range

called for by the United States Sentencing Guidelines.  To the extent that the parties disagree

about the guideline computations, the recitation below identifies the matters which are in dispute.

The Guideline calculation below is the good faith estimate of the parties, but it is only an

estimate.  The parties understand that the government also has an independent obligation to assist

the Court in making an accurate determination of the correct guideline range.  To that end, the

government may argue that facts identified in the presentence report, or otherwise identified during the sentencing process, affect the estimate below.

**Count 6 (Wire Fraud):**

    a)    Under USSG §2B1.1(a)(1), the base offense level is **7**.

    b)    A **18-level increase** applies because the defendant's intended loss was between $3,500,000 and $9,500,000. § 2B1.1(b)(1)(J).

    c)    A **2-level increase** applies because the defendant derived more than $1,000,000 in gross receipts from one or more financial institution as a result of the offense. § 2B1.1(b)(17)(A).

    d)    The adjusted offense level is **27**.

**Count 8 (Money Laundering):**

    a)    Under USSG §2S1.1(a), the base offense level is **27**.

    b)    A **1-level increase** applies because the defendant is being convicted under 18 U.S.C. § 1957. § 2S1.1(b)(2)(A).

    c)    The adjusted offense level for Count 8 is **28**.

**Combined Sentence:**

    a)    The total adjusted offense level is 28. § 3D1.3.

    b)    The defendant should receive a **3-level downward adjustment** for timely acceptance of responsibility. § 3E1.1. The resulting total offense level is **25**.

    c)    The parties understand that the defendant's criminal history computation is tentative and based on the defendant's prior convictions. The parties believe the defendant is in criminal history category **I**.

    d)    The career offender/criminal livelihood/armed career criminal adjustments do not apply.

    e)    The advisory guideline range resulting from these calculations is **57–71 months**. However, in order to be as accurate as possible, with the criminal history category undetermined at this time, the offense level(s)

estimated above could conceivably result in a range from **57 months** (bottom of Category I) to **137 months** (top of Category VI). The guideline range would not exceed, in any case, the cumulative statutory maximums applicable to the counts of conviction.

f)      Pursuant to guideline § 5E1.2, assuming the estimated offense level above is correct, the fine range for this offense would be **$20,000 to $200,000**, plus applicable interest and penalties.

g)      Pursuant to guideline § 5D1.2, if the Court imposes a term of supervised release, that term is at least 1 year, but not more than 3 years.

h)      Pursuant to guideline §5E1.1(a)(1), the Court shall enter a restitution order for the full amount of the victims' losses, which the parties estimate to be **$1,793,718.75**, plus interest on the EIDLs and PPP loans accruing through the date of the sentencing hearing and less any repayments that the defendant has made towards the loans prior to sentencing.

The parties understand that the Court is free, upon consideration and proper application of all 18 U.S.C. § 3553 factors, to impose that reasonable sentence which it deems appropriate in the exercise of its discretion and that such sentence may be less than that called for by the advisory guidelines (in length or form), within the advisory guideline range, or above the advisory guideline range up to and including imprisonment for the statutory maximum term, regardless of any computation or position of any party on any 18 U.S.C. § 3553 factor.

/ /

/ /

/ /

/ /

Page 17 of 18

## VII.        ENTIRE AGREEMENT

The agreement disclosed to the Court is the entire agreement.  There are no other promises, agreements or "side agreements," terms, conditions, understandings, or assurances, express or implied.  In entering this agreement, neither the government nor the defendant has relied, or is relying, on any other terms, promises, conditions or assurances.

Date:  1/26/26       _____
                       TAREK KASSEM
                       Defendant

Date:  1/26/2026      _____
                       JARED WESTBROEK
                       Attorney for Defendant

Date:  7/8/2026       _____
                       NICOLE CASSIDY
                       Assistant U.S. Attorney