**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Criminal Case No. 24-cr-00088-NYW

UNITED STATES OF AMERICA,

Plaintiff,

v.

TAREK KASSEM,

Defendant.

---

## GOVERNMENT'S RESPONSE TO DEFENDANT'S REQUEST FOR A PROBATIONARY SENTENCE

---

At the November 9, 2026 sentencing hearing, the government will respectfully request that the Court sentence defendant Tarek Kassem to 37 months' imprisonment, followed by three years' supervised release. The government will further request that the Court enter a restitution order for $2,041,649.51[1], which represents the full amount of loss sustained by the victim of the defendant's scheme.

---

[1] This amount includes: (1) $1,426,000 of Economic Injury Disaster Loans, $4,000 of Economic Injury Disaster Loan Grants, and $307,367 of Paycheck Protection Program loans that were approved and funded for the defendant's businesses; (2) $16,826.75 of processing fees that the SBA paid to the third-party lenders for underwriting and servicing the defendant's Paycheck Protection Program loans; (3) $247,930.76 of interest accrued through the date of sentencing on the defendant's loans; and (4) $39,525 of unemployment benefits that the defendant received. (ECF Nos. 53 ¶¶ 33–35; 53-1.)

## I. GUIDELINES CALCULATION

Following the defendant's guilty plea to one count of wire fraud (18 U.S.C. § 1343) and one count of money laundering (18 U.S.C. § 1957), the United States Probation Office submitted to the Court a presentence investigation report calculating the defendant's offense level at 21 and criminal history category at I, which results in a guidelines range of 37–46 months' imprisonment. (ECF No. 53 ("PSR") ¶¶ 51, 58–59, 94; *see also* ECF No. 53-1 at 2.) The government agrees that this is an accurate guidelines calculation.

## II. THE GOVERNMENT'S REQUESTED SENTENCE WILL EFFECTUATE THE GOALS OF 18 U.S.C. § 3553(A)

During sentencing, the Court must calculate the sentencing range recommended by the United States Sentencing Guidelines ("U.S.S.G.") and consider the sentencing factors set forth in 18 U.S.C. § 3553(a). *See United States v. Barnes*, 890 F.3d 910, 915 (10th Cir. 2018).

The Sentencing Guidelines "reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate" to carry out the statutory sentencing purposes reflected in Section 3553(a). *Rita v. United States*, 551 U.S. 338, 349 (2007). Section 2B1.1 represents the Sentencing Commission's sound policy judgment that white-collar crimes are serious offenses, and the sentences for those crimes must be calibrated to

promote respect for the law. Significantly, "the sentencing guidelines sought to address the inequities of prior sentencing practices that tended to punish white collar economic crimes less severely than other comparable blue collar offenses." *United States v. Fishman*, 631 F. Supp. 2d 399, 403 (S.D.N.Y. 2009).

**A. Nature and Circumstances of the Offense**

This case involves an individual who filed fraudulent Economic Injury Disaster Loan ("EIDL") and Paycheck Protection Program ("PPP") applications in an attempt to obtain millions of dollars of funds that were intended to serve as a lifeline for struggling businesses during an unprecedented global pandemic. Significantly, the defendant's actions cannot be excused as a momentary lapse of judgment or a one-time mistake. Rather, the defendant submitted fraudulent EIDL and PPP applications on behalf of three different businesses over the course of two years. In these loan applications, the defendant made materially false representations and certifications regarding, *inter alia*, his businesses' number of employees and average monthly payrolls, the businesses' gross revenues and cost of goods sold, and his intent to use loan proceeds only for business-related purposes in accordance with the program guidelines.

As a result of his scheme, the defendant obtained $1,733,367 in EIDL, PPP, and EIDG funds. (*See* ECF No. 44 at 13.) And he did not stop there. At the same time, he also obtained $39,525 of unemployment insurance ("UI") benefits and sought additional EIDL and PPP loans that were not funded. (*See id.* at 13–14.) As

set forth in the Plea Agreement, the total amount of the UI, EIDL, EIDG, and PPP applications, funded and unfunded, attributed to the defendant is $3,866,892. (*See id.* at 14.)

The nature and circumstances of the defendant's offense warrant a sentence of 37 months' imprisonment.

**B. History and Characteristics of the Defendant**

In support of his request for a probationary sentence, the defendant emphasizes that he committed the instant offense while suffering from a gambling addiction, which he suggests supports his request for a probationary sentence. (ECF No. 52 at 3–8.) Notably, the defendant has not been officially diagnosed with a compulsive gambling disorder (*see id.* at 7), has not received any treatment relating to gambling (ECF No. 53 ¶¶ 76–77), and still gambles on a weekly basis (*id*). He simply asserts (without any official diagnosis) that he "meets the criteria" for a compulsive gambling disorder but has "toned it down." (ECF No. 52 at 7; ECF No. 53 ¶ 77.) However, even assuming the defendant was motivated in part by a gambling addiction, it does not excuse his criminal conduct. As the Honorable James O. Browning recognized in *United States v. Gonzales*, "[u]nfortunately, the nation's prisons and criminal justice system contain many who have some addiction, mostly drugs and alcohol. Even gambling addiction is just a reason for a need for money, and almost everyone in the criminal justice system needs money." 163 F. Supp. 3d 1078, 1124 (D.N.M.), *aff'd,* 844 F.3d 929 (10th Cir. 2016).

The defendant also justifies his request for probation based on his family circumstances and the fact that he "buckled" under stress. (ECF No. 52 at 7 & 13.) But the COVID-19 pandemic was undoubtedly a stressful time for millions of Americans, the vast majority of whom did not resort to committing multi-million dollar frauds. Moreover, while any potential family hardships that may result from the defendant's incarceration are unfortunate and heartbreaking, they are a direct result of his own choices. After all, "[a] crime often inflicts harm, not only on a direct victim, but on those in a defendant's circle of family and friends who depend on that defendant for all manner of support." *United States v. Cole,* No. 18-20237, 2021 WL 194194, at *3 (E.D. Mich. Jan. 20, 2021); *see also, e.g.*, *United States v. Shortt*, 919 F.2d 1325, 1328 (8th Cir. 1990) (recognizing that "[a]ll families suffer when one of their members goes to prison").

In support of his request for a probationary sentence, the defendant further argues that the Bureau of Prisons ("BOP") is ill-equipped to handle his medical conditions. (ECF No. 52 at 8–12.) The government by no means dismisses the defendant's health conditions, which are documented in the PSR. (ECF No. 53 ¶¶ 73–75.) But there is little evidence that the defendant's illnesses are so unusual or complex that the BOP is incapable of managing them while the defendant serves a custodial sentence. After all, "many defendants who stand before federal courts for sentencing and in prison have some health problems," *United States v. Rosales-Valdez*, 375 F. Supp. 2d 1165, 1172 (D.N.M. 2005), and the BOP regularly assigns

each inmate to an appropriate institution based on that inmate's medical and mental health needs. *See Care Level Classification for Medical and Mental Health Conditions or Disabilities* at 2–3, Federal Bureau of Prisons (May 2019), *available at* https://www.bop.gov/resources/pdfs/care_level_classification_guide.pdf (last accessed Nov. 2, 2026).

Ultimately, the defendant's request for a probationary sentence places undue weight on the defendant's history and characteristics to the exclusion of the other § 3553(a) factors.

**C. Deterrence and Respect for the Rule of Law**

The government respectfully submits that a custodial sentence of 37 months is necessary to promote specific deterrence, general deterrence, and respect for the rule of law.

Although COVID-19 loan programs undoubtedly helped millions of struggling small businesses around the country, the need for emergency and expedited relief led to the removal of certain loan underwriting requirements and opened the door to fraud. As a result, many individuals made the calculated decision that their COVID-19 loan fraud would go undetected and unprosecuted. *See, e.g.*, Staff of House Committee on Small Business, 118th Cong., *A Miscalculated Risk: Fraud Within the SBA's COVID Lending Programs* (2024), available at https://smallbusiness.house.gov/uploadedfiles/house_committee_on_small_business_-_covid-19_pandemic_loan_fraud_staff_report.pdf (estimating that approximately

$200 billion from COVID-19 lending programs was distributed to fraudulent recipients).

Courts around the country have repeatedly recognized that general deterrence can have a pronounced effect in the context of white-collar crime as individuals often make calculated determinations about the potential reward and the likelihood that they will face a significant sanction if caught. *See, e.g.*, *United States v. Sample*, 901 F.3d 1196, 1200 (10th Cir. 2018) (recognizing that "[d]efendants in white-collar crimes often calculate the financial gain and risk of loss, and white-collar crime therefore can be affected and reduced with serious punishment" (quoting *United States v. Kuhlman*, 711 F.3d 1321, 1329 (11th Cir. 2013))). Thus, "[g]eneral deterrence is more apt, not less apt, in white collar crime cases." *United States v. Howard*, 28 F.4th 180, 186 & 209 (11th Cir. 2022) (recognizing that "[l]ike bears to honey, white collar criminals are drawn to billion-dollar government programs"); *United States v. Brown*, 880 F.3d 399, 405 (7th Cir. 2018) (agreeing with the "widely accepted principle" that white collar crimes are "prime candidates for general deterrence").

Congress has "emphasized the critical deterrent value of imprisoning serious white collar criminals, even where those criminals might themselves be unlikely to commit another offense." *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006); *United States v. Morgan*, 635 F. App'x 423, 450 (10th Cir. Nov. 6, 2015) (recognizing that sentencing major white-collar criminals to "small fines and little

or no imprisonment . . . creates the impression that certain offenses are punishable only by a small fine that can be written off as a cost of doing business" (quoting S.Rep. No. 98–225, at 76 (1983), reprinted in 1984 U.S.C.C.A.N. 3182, 3259)).

Furthermore, while the defendant qualifies for the zero-point offender reduction set forth in U.S.S.G. § 4C1.1 (ECF No. 53 ¶ 48), he does have a criminal history that includes prior check frauds, for which he received deferred judgments that were ultimately dismissed (*see id.* ¶¶ 53–56). This history underscores the need to impose a sentence of imprisonment that promotes respect for the rule of law and specific deterrence.

**D. Avoidance of Unwarranted Sentencing Disparities**

While not binding on the Court, the U.S. Sentencing Guidelines establish a range that roughly reflects the objectives of Section 3553(a) based on similar criminal histories and similar offenses. The defendant's requested variance would create unwarranted sentencing disparities between himself and others with the same guidelines range, as well as with other defendants who have been sentenced in this district for COVID-19-related fraud. *See United States v. Davis*, 537 F.3d 611, 617 (6th Cir. 2008) ("One of the central reasons for creating the sentencing guidelines was to ensure stiffer penalties for white-collar crimes and to eliminate disparities between white-collar sentences and sentences for other crimes.").

In this district, custodial sentences have been found appropriate for individuals convicted of similar COVID-19 loan fraud. *See United States v.*

*Harrington*, 22-cr-00324-NYW (51-month sentence based on 57–71-month guidelines range); *United States v. Schneider*, 24-cr-191-NYW (12-month-and-a-day sentence where defendant self-reported his own PPP loan fraud); *United States v. Mendez*, 24-cr-228-SKC (41-month sentence based on 41–51-month guidelines range); *United States v. Washington*, 22-cr-00187-WJM (90-month sentence based on 108–135-month guidelines range); *United States v. Foreman*, 21-cr-00165-RM (66-month sentence based on 63–78-month guidelines range); *United States v. Lester*, 21-cr-230-DDD (30-month sentence based on 41–51-month guidelines range); *United States v. Lacona*, 23-cr-104-DDD (24-month sentence based on 33–41 month guidelines range); *United States v. Scott*, 24-cr-137-DDD (8-month sentence based on 21–27-month guidelines range); *United States v. Lain*, 21-CR-00175-WJM (32-month sentence based on 41–51-month guidelines range where defendant had repaid millions in restitution prior to sentencing); *United States v. Stonebarger*, 21-CR-00392-RM (41-month sentence based on 37–46-month guidelines range); *United States v. Zaghab*, 21-CR-00188-RBJ (30-month sentence based on 33–41-month guidelines range).

Considering the individualized circumstances of other cases in this district that also have involved pandemic relief fraud, the government believes a sentence of 37 months' imprisonment is appropriate and serves the objectives of sentencing.

## III. CONCLUSION

For the reasons set forth above, the government respectfully requests that the Court deny the defendant's motion for a below-guidelines sentence and impose a bottom-of-the-guidelines sentence of 37 months' imprisonment, followed by a three-year term of supervised release, and order restitution in the amount of $2,041,649.51.

Dated this 2nd day of November, 2026.

PETER MCNEILLY
United States Attorney

By: *s/ Nicole Cassidy*
Nicole Cassidy
Assistant United States Attorney
1801 California Street, Suite 1600
Denver, Colorado 80202
Tel: (303) 454-0100
Nicole.Cassidy@usdoj.gov
Attorney for the Government

## CERTIFICATION REGARDING USE OF ARTIFICIAL INTELLIGENCE

The undersigned counsel certifies that generative artificial intelligence was not used to draft this filing.

**CERTIFICATE OF SERVICE**

I hereby certify that on November 2, 2026, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record in this case.

*s/ Nicole Cassidy*
United States Attorney's Office